J. A. Byerly v. Commissioner. J. A. Byerly v. Commissioner. J. A. Byerly Trust, J. M. Beck, Mae Ward Byerly and George Carruthers, Trustees v. Commissioner.
Byerly v. Commissioner
Docket Nos. 463, 464, 465.
United States Tax Court
1944 Tax Ct. Memo LEXIS 326; 3 T.C.M. (CCH) 245; T.C.M. (RIA) 44090; March 21, 1944
*326 J. H. Amick, C.P.A., 809 Majestic Bldg., Detroit, Mich., for the petitioners. Philip M. Clark, Esq., for the respondent. STERNHAGEN Findings of Fact and Memorandum Opinion Deficiencies in income tax of J. A. Byerly were determined as follows: 1937, $18,990.63; 1938, $19,834.45; 1939, $39,821.86; 1941, $38,491.44. Byerly assails all the determinations because they attribute to him the income of a trust of which he was the settlor; and, as to the 1937 and 1938 deficiencies, because they are barred by the statute of limitations. Deficiencies in income tax were determined as to the J. A. Byerly Trust as follows: 1938, $6,046.14; 1939, $17,170.42; 1940, $33.69. These are assailed by the Trust; but it is agreed that, if the Trust income is not taxable to Byerly, it is taxable to the Trust, in which event, a deduction shall be made for taxes paid for the beneficiaries. Findings of Fact James A. Byerly, of Owosso, Michigan, is president of the J. A. Byerly Company, a Michigan corporation, organized in 1924 to take over his established business. The Corporation operates 41 retail food stores. Prior to December 31, 1935. Byerly held 16,990 of the 19,250 shares outstanding, the remaining *327 2,260 shares being held, until some time in 1939, by five employees of the Corporation. A "Trust Indenture" dated December 31, 1935, was executed by Byerly creating the J. A. Byerly Trust. Mae Ward Byerly, his wife, Jens M. Beck and Carl O. Uhlman were named as trustees, and the beneficiaries were Byerly's wife and two sons, James Arthur, born November 27, 1920, and Robert William, born June 11, 1925. To the trustees Byerly transferred 8,100 shares of the Corporation. The Trust Indenture is as follows: "TRUST INDENTURE "THIS INDENTURE made at Owosso, Michigan, this 31st day of December, A.D. 1935, WITNESSETH: "WHEREAS, James Arthur Byerly of Owosso, Michigan, hereinafter sometimes called "Settlor", has, by diligent effort and prudent business methods, pursued by him throughout the past thirty-five years or more, accumulated a sizeable estate in his own right, consisting of Real Estate, Corporate Stock, a going business, etc., etc., and "WHEREAS, the several members of said James Arthur Byerly's immediate family have in the past assisted him greatly in the accumulation of said estate, and feeling grateful to them for such assistance, as well as having a desire to assist his two *328 sons financially so that they may secure a start in business without the necessity of being subjected to the hardships, deprivations and menial toil which was the lot of said James Arthur Byerly when he was a young man, and "WHEREAS, Settlor's experience dictates the inadvisability of making substantial gifts to inexperienced young men unless the control and management of such gifts be properly safeguarded and directed by persons of more mature experience and judgment, "NOW, THEREFORE, I, James Arthur Byerly, in consideration of the above and in consideration of the love and affection that I hold for my wife, Mae Ward Byerly, and my sons, James Arthur Byerly, Jr., and Robert William Byerly, by these presents, do hereby set aside, give, assign and transfer to: "The Trustees of the 'J. A. Byerly Trust' Mrs. Mae Ward Byerly Jens M. Beck Carl O. Uhlman the following described property: 8100 shares of the Common Capital Stock of J. A. Byerly Company, a Michigan corporation, said shares having a present fair value of $ . TO HAVE AND TO HOLD, NEVERTHELESS, IN TRUST, for the use and benefit of the persons herein designated as Beneficiaries of this trust, and under the provisions, *329 conditions and limitations hereinafter set forth. "1. TRUSTEES: "Legal title and control of the property and all benefits that may accrue to said property, the subject matter of this Trust Indenture, shall at all times vest in and be under the exclusive control of the Trustees herein named, or their successors in trust, and for the purposes herein outlined, to-wit: "(a) The Trustees shall collect the income that may accrue to said property and shall have the right to sell, assign, transfer and convey any part or all of the corpus of the trust and benefits that may have accrued that have not been distributed, whether said trust res be real, personal or mixed, and shall have exclusive discretion in making investments or sales, and deal with said property when and if they may deem it prudent so to do, for the benefit of the trust. "(b) The Trustees shall pay all taxes and expenses and costs of administering the trust, and distribute the net income and principal arising therefrom as hereinafter directed. "(c) Out of the net income of the trust estate the Trustees shall pay to each of the beneficiaries his or her proper share of said net income from said trust estate in periodic payments *330 to be determined by the Trustees, but in any event, not less than once in each calendar year, provided, however, that if in the better judgment of the Trustees they deem it advisable not to make payments to the Beneficiaries during the calendar year, but to hold such income, or any part thereof, or make investments for their benefit, the Trustees shall then make credits to the account of each Beneficiary of that amount which would have been paid to each Beneficiary had payment been made, but not less than once in each calendar year. "(d) In the vent that a vacancy occurs of a Trustee, either by death, resignation, legal incapacity to act, or refusal to act, the remaining Trustees are emplowered to fill said vacancy by appointment, but said appointment shall be by unanimous consent of the remaining Trustee, or Trustees. "(e) The Trustees are emplowered to accept as additions to the corpus of the trust any and all gifts, whether they be given by the Settlor of this trust, or any other person, and said additions to said trust shall be dealt with and distributed in accordance with the provisions of this indenture, and in the manner outlined herein and for the benefit of the Beneficiaries *331 herein named. "(f) The Trustees may at any time in the future in their uncontrolled discretion, with the written consent of each of the Beneficiaries then entitled to the benefits of the trust estate, convey any part or all of the corpus and/or income of this trust estate to James Arthur Byerly, the Settlor, or to his nominee, whereupon the trust in respect to such property as may be so transferred shall terminate and cease and the Trustees discharged from any further duty or responsibility in respect thereto. "(g) The Trustee shall receive, as their compensation for acting as Trustees, a sum equal to % of the yearly income of said trust. "2. BENEFICIARIES: "(a) The persons who are entitled to the use, benefit and enjoyment of the property herein conveyed, and the increment thereof, and who are to be known as Beneficiaries of this trust estate, are: My wife - Mrs. Mae Ward Byerly My son - James Arthur Byerly, Jr. My son - Robert William Byerly Each of the parties herein named as Beneficiary during their respective lifetime shall be entitled to an undivided one-third beneficial interest in the income as well as the corpus of the trust and the Trustees are directed to hold *332 and pay to the Beneficiaries under the conditions herein elsewhere mentioned. "(b) In the event of the death of any of the Beneficiaries specifically named in Subdivision (a) of this paragraph, the beneficial interest of the deceased to share in this trust estate shall cease. All interests of the deceased shall remain as part of the trust res and the remaining Beneficiaries shall share in the interest formerly enjoyed by the deceased, and the Trustees are directed to treat such share as the beneficial income or property of the surviving Beneficiaries, share and share alike, provided, however, that should either James Arthur Byerly, Jr., or Robert William Byerly, or both, die during the life of this trust, leaving lawful issue, the Trustees are then directed to treat said lawful issue as it would have treated the deceased beneficial parent of said issue, and said issue shall be entitled to share and share alike, per stirpes, for that portion of the beneficial estate or corpus, in thesame manner that its deceased parent would have been entitled to had said parent been living. "(c) Should all of the persons named as Beneficiaries in subdivision (a) of this paragraph die leaving no *333 living lawful issue, then in that event this trust shall immediately terminate and the trust estate shall thereupon be distributed to Settlor, if he be living, otherwise to the legal heirs of Settlor, according to the Statutes of Descent and Distribution. "3. TERM OF THE TRUST: This trust shall continue in full force and effect during the lifetime of the last surviving Beneficiary named in paragraph (1) and until the youngest of any living lawful issue of said named Beneficiary reaches the age of twenty-one (21) years, unless sooner terminated in accordance with the provisions of this Trust Indenture, or by operation of law. "Witness my signature this 31 day of Dec., A.D. 1935. (Signed) James Arthur Byerly, SETTLOR." Beck is a director, vice-president and merchandise manager of the Corporation. His salary in 1937 was about $5,000 a year; in 1941, $10,000, and now is $12,000. When the trust was made, Byerly asked Beck, who was then manager of the business of the Corporation, to be a trustee because of his familiarity with the business of the Corporation the shares of which composed the corpus of the trust. Byerly, who is president, could remove him from his position with the Corporation *334 at any time. Beck has handled no investments other than those of the Trust, except his own. Uhlman had been with the Corporation a long time and was secretary. He died in the latter part of December, 1940, and George Carruthers was then appointed trustee. Carruthers was appointed by the two trustees at Beck's suggestion, with Mrs. Byerly's acquiescence, because Carruthers had been associated with Beck in several businesses and was "very familiar with the food business." Carruthers was not a regular employee but was consulting accountant for the Corporation, for the Trust and for Byerly, individually, and prepared their income tax returns. The account books of the Trust were kept under the supervision of Carruthers by a bookkeeper employed by Byerly. None of the trustees has ever received any compensation for services as trustee. The meetings of the trustees were informal and at odd times; no minutes were kept. As a rule, matters were discussed by Beck and Uhlman (later Carruthers) at odd times during business hours, Mrs. Byerly being later informed, sometimes by telephone, and acquiescing in their plans. "There were not many decisions to be made and they were rather ordinary." *335 The accounts of the Trust were kept in a book containing general ledger, receipts, disbursements and beneficiary accounts. A bank account was kept with the State Savings Bank, and the trustees signed the checks. In 1936, at a cost of $116,160.56, the Trust acquired 4,639 additional Corporation shares from Byerly, after which, until January 1, 1942, Byerly held 4,251 shares. For the 4,639 shares, the Trust gave Byerly two notes, for $40,660.83 and $40,660.84, and cash for the balance. The notes were paid in 1937 and 1938. In 1939, the 2,260 Corporation shares held by employees were acquired by the Trust at a cost of $43,731. During 1941, 6,000 additional Corporation shares were acquired by the Trust from the Corporation at a cost of $60,000, and 4,000 shares were distributed to the beneficiaries - 1,334 to Mae Ward Byerly, and 1.333 to each of the two sons. The 25,250 shares then outstanding were held as follows: Number
of Shares
Byerly Trust
16,999
J. A. Byerly
4,251
Mae Ward Byerly
1,334
James Arthur Byerly, Jr
1,333
Robert William Byerly
1,333
Total
25,250
Mrs. Byerly had no separate investments of her own. In 1936, the Trust purchased mortgages at a cost *336 of $25,447.38, and they were reduced each year to a balance of $4,414.50 as of December 31, 1941. The total income of the trust from December 31, 1935, to December 31, 1941, was $248,664.52. Of this amount, $3,676.70 was on deposit in the bank on December 31, 1941. The remainder of $244,987.82 had been expended as follows: 4,639 Byerly Company shares
$116,160.56
2,260 Byerly Company shares
43,731.00
6,000 Byerly Company shares
60,000.00
Mortgages of $25,447.38 of which
on December 31, 1941, remained
4,414.50
Federal income taxes paid for bene-
ficiaries
20,681.76
$244,987.82
As of December 31, 1935, each beneficiary account on the trust books was credited with $60,750, being one-third of the value of the 8,100 Corporation shares transferred by Byerly to the Trust. At the end of 1935 and of 1936, each of these accounts was credited with one-third of the annual income of the Trust; at the end of 1937, of 1938 and of 1939. the trust income, less federal income taxes paid for the account of the beneficiaries, was credited to the beneficiary accounts; at the end of 1940, of the trust income of $889.65, one-third was credited to each beneficiary account; and at the end *337 of 1941, of $5,374.67 (the income over $40,000 representing the distribution of Corporation shares), one-third was credited to each beneficiary account. In 1938, 1939 and 1940, the Trust paid federal income taxes of $2,746,97, $2,690.39 and $7,506.27, for the account of the beneficiaries, but no actual distributions of trust income were otherwise made. Byerly's individual income tax return for 1937 was filed on March 15, 1938, and the return for 1938 was filed March 15, 1939. The notice of deficiency covering both years was mailed October 12, 1942. From the gross income shown on the 1937 return, the taxpayer omitted the trust income of $37,826.19; and from the gross income shown on the 1938 return, he omitted the trust income of $37,644.56. This was in each of those years an omission from gross income of more than 25 per cent of the amount of gross income stated on the return. Memorandum Opinion STERNHAGEN, Judge: 1. These two determinations of deficiency are recognized by the Commissioner to be inconsistent; and he concedes that the income of the Trust is to be taxed to the Trust only if it is held to be not attributable to Byerly. So the primary question is whether, under the *338 doctrine of , the trust income is to be taxed to Byerly, the settlor. We think the Commissioner was correct in including the trust income in Byerly's income as income upon which he is taxable. The Trust is for the benefit of Byerly's wife and children, both of whom were minors when the Trust was made in 1935 and during all the years in question until November 27, 1941, when the older boy became twenty-one. Therefore the Trust was a means of reallocating the family income within the family group. From the evidence, we are convinced that, notwithstanding the existence of the Trust, Byerly was still in substantial control of the shares and income which were in the name of the trustees or credited on the trust books to the beneficiaries. Beck and Uhlman or Carruthers were named trustees by Byerly not for their independence of judgment as fiduciaries but because they were employees of the Corporation which he had set up and controlled. As witnesses, they made it quite clear that they knew little about the affairs of the Trust. They were at least tractable before Byerly's authority as president of the Corporation and indicated *339 no separate discretion in the management of the Trust. Mrs. Byerly did not testify, and the testimony of Beck shows that she did not make any independent contribution to the management; she merely acquiesced in the informal "plans" suggested by her two co-trustees. She had no independent investments and was therefore entirely dependent upon her husband, the settlor of the Trust. The income of the Trust, which was all derived from the shares of the Corporation which Byerly controlled, was not distributed to the beneficiaries, except the amounts used to pay their income taxes and the amount ($40,000) used to buy from the corporation the 4,000 shares which were distributed in 1941. The evidence shows no act by the trustees to indicate any diversity of interest between Byerly and the Trust. As the Commissioner's brief puts it, "The power which Byerly retained is not to be determined by considering the niceties of construction of the trust instrument, but is established by the actualities of the factual situation." Byerly's interest after the creation of the Trust still blended imperceptibly with his individual ownership as it had been before. The income from his business was still the *340 means whereby he assured the support and maintenance of his family, and he still controlled the business, even though a majority of the shares were in the name of the Trust. Indeed, by the terms of the indenture, he could receive the income himself if his wife and minor children consented. We are, therefore, of opinion upon the evidence that the Trust is not sufficiently substantial to require that the income from the shares in its name be not taxed to Byerly, and the determination is in that respect sustained. 2. Because of the omission of the trust income from gross income shown on the returns for 1937 and 1938, the question arises whether the statutory period of limitation expired when the deficiency notice was mailed. The mailing was after the expiration of three years, the period of Section 275(a), but before the expiration of five years, the period of Section 275(c). If the amount of the trust income omitted was more than 25 per cent of the gross income stated on the return, the five year period is open to the Commissioner. Both parties agree upon the amount omitted ($37,826.19 for 1937 and $37,644.56 for 1938), but disagree upon the amount stated on the return to be used *341 as the basis of the percentage. Therefore, mathematically, the five year period of Section 275(c) is open unless the gross income stated in the return is less than $151,304.76 for 1937 and $150,578.24 for 1938. The disagreement comes down to the taxpayer's contention that some items are being improperly excluded by the Commissioner from the amount of gross income stated in the return, and that if those items were counted the resulting figure would be sufficiently high to bring the omitted amounts below 25 per cent. On the face of Byerly's returns "Total Income" was shown as $65,734.32 for 1937 and $75,193.76 for 1938, and these are the figures which the Commissioner used as the basis of the 25 per cent, - obviously low enough for Section 275(c). The taxpayer contends that the basis of the percentage is $255,691.13 in 1937, and $224,949.76 in 1938, the result of computations from figures shown not on the face of the return but in schedules filed as part of it. Meanwhile, the Commissioner now in his brief says that the outside figures which may be used are $97,869.02 for 1937, and $110,002.46 for 1938, both figures being still less than enough to take the case out of Section 275(c). *342 Although we have doubt as to whether the application of Section 275(c) requires a detailed analysis of the schedules appended to the return, it is apparent that, even so, the taxpayer's position cannot be sustained. On the face of the return, Item 10, "Gain (or loss) from sale or exchange of property," is shown as a loss of $1,875.38. In the appended schedules the details show that it is the net result of combining a group of losses on transactions in securities amounting to $17,613.54 and a group of gains amounting to $14,210.48. The taxable amount of gains in the latter group by reason of the percentage provision of the statute (Section 117 (a)) is $13,154.19. Clearly, the taxpayer is entitled to have the $13,154.19 taxable gain included in his gross income for the purposes of Section 275(c), even though he may not include therein the amount of actual gain in excess of the taxable percentage. . $10,573.39 farm income was apparently omitted by the Commissioner from the gross income; but he does not adhere to this and we may take it to be incorrect. Item 9 on the face of the return shows $13,911.24 which the Commissioner *343 used as an item of gross income, and he now concedes that this should be increased to $25,721.09. The taxpayer, after claiming that $144,269.42 is the amount of gross income from his bakery business, now reduces this to $66,831.73. This figure of $66,831.73 is still too high since it fails to subtract substantial amounts shown on the return as items of cost of goods sold, and such subtraction is necessary ( in order to avoid confusing gross receipts with gross income. It is apparent that with the adjustments of the later figures of $97,869.02 and $110,002.46 used by the Commissioner the ultimate figures are substantially less than the necessary $151,304.76 and $150,578.24, and that the omitted amounts are more than 25 per cent of the gross income stated in the returns. The determinations for 1937 and 1938 are not barred by the statute of limitations. Decisions will be entered under Rule 50.